IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MIGUEL A. RAMIREZ-ORTIZ, JOSE IRIZARRY-ORTIZ, JAVIER IRIZARRY-ORTIZ, and ELIEZER IRIZARRY-ORTIZ, **Plaintiffs**, v. CORPORACION DEL CENTRO CARDIOVASCULAR DE PUERTO RICO Y DEL CARIBE, *et al.*, **Defendants**. | CIVIL NO. 12-2024 (FAB) |

**MEMORANDUM AND ORDER**

BESOSA, District Judge.

Before the Court is the motion for summary judgment filed by defendant Dr. Anibal Lugo-Rosas, (Docket No. 282), and plaintiffs' opposition, (Docket No. 330). For the reasons discussed below, the Court **DENIES** Dr. Lugo's motion for summary judgment. Dr. Lugo also filed a motion *in limine*, (Docket No. 342), requesting that the unsworn statement under penalty of perjury of plaintiffs' expert, Dr. Carl Adams, be precluded for purposes of summary judgment and trial. Because the Court has ruled that Dr. Adams' statement is a sham affidavit offered for the sole purpose of creating an issue of material fact for summary judgment, the Court **GRANTS** Dr. Lugo's motion *in limine*.

## I.  Relevant Facts

Mr. Miguel A. Ramirez-Torres, age 72 and a resident of Sabana Grande, Puerto Rico, was initially treated at Hospital Bella Vista ("HBV"), in Mayagüez, Puerto Rico on December 31, 2011 due to chest pain.  (Docket No. 283 at p. 3; Docket No. 331 at p. 16.)  While at HBV, Mr. Ramirez received medical care, including lytic therapy, from various doctors.  (Docket No. 283 at p. 3; Docket No. 331 at p. 2.)  After treatment at HBV, Mr. Ramirez was transferred to Corporacion del Centro Cardiovascular de Puerto Rico y del Caribe ("CCCPRC") on January 3, 2012.  (Docket No. 283 at p. 4; Docket No. 331 at p. 3; Docket No. 283-4 at p. 24.)  Upon arrival at CCCPRC, Mr. Ramirez underwent a diagnostic catheterization by Dr. Edwin Perez-Marrero, a cardiologist.  (Docket No. 283-4 at p. 21.)  During the course of the procedure, Dr. Perez-Marrero found two blockages:  the first, the culprit lesion, was located in Mr. Ramirez's right coronary artery, had a thrombus in it, and was 80 percent stenosis; the second was a small focal lesion, measuring 80 or 90 percent, in the mid-left descending artery ("LAD").  (Docket No. 283 at p. 4; Docket No. 331 at p. 3; Docket No. 283-4 at p. 25.)  Dr. Perez-Marrero placed one stent and only treated the culprit lesion.  (Docket No. 283 at p. 4; Docket No. 331 at p. 4.)  He then explained to the patient's family that Mr. Ramirez would need treatment for the LAD blockage, and told them to call his office after January 7 for an appointment for a staged PCI to the

Civil No. 12-2024 (FAB)                                               3

LAD.  (Docket No. 283 at p. 5; Docket No. 331 at p. 4; Docket No. 283-4 at p. 30.)  After performing the first stent, Dr. Perez-Marrero evaluated Mr. Ramirez and ultimately discharged him because the patient "felt okay."  (Docket No. 283 at p. 5; Docket No. 331 at p. 5; Docket No. 283-4 at p. 42.)

On January 9, 2012, Mr. Ramirez experienced severe chest pain and sought care from the emergency room of Hospital de la Concepcion ("HDLC") in San German, Puerto Rico.  (Docket No. 85 at p. 8; Docket No. 283 at p. 5.)  Dr. Lugo is the chief cardiologist and the medical director of the catheter laboratory at HDLC. (Docket No. 283-1 at pp. 14-15.)  Dr. Lugo's initial intervention with Mr. Ramirez occurred on January 10, 2012 at HDLC, in response to a consultation by one "Dr. Guzman," Mr. Ramirez's primary cardiologist.  (Docket No. 283 at p. 6; Docket No. 331 at p. 5.) Mr. Ramirez was stable at the time of Dr. Lugo's evaluation. (Docket No. 283 at p. 6; Docket No. 331 at p. 6.)  On January 11, 2012, Mr. Ramirez was transferred to Mayagüez Medical Center for a percutaneous coronary intervention, which was performed by Dr. Lugo.  (Docket No. 283 at p. 7; Docket No. 331 at pp. 6-7.) While conducting the procedure, Dr. Lugo found a 90% occlusion in the distal middle area and another 70% obstruction in the proximal middle area of the anterior LAD, so he placed three stents in Mr. Ramirez's LAD.  (Docket No. 283 at p. 9; Docket No. 331 at p. 8; Docket No. 283-1 at pp. 38 & 40.)  After the procedure,

Dr. Lugo spoke to CCCPRC's Dr. Perez-Marrero about the percutaneous coronary intervention, explaining that he believed that Mr. Ramirez's right coronary stent had a malapposition problem. (Docket No. 283-1 at p. 64.)  Dr. Perez agreed to accept the patient back at CCCPRC, and arrangements were made over the next day to secure a bed for Mr. Ramirez, who was stable at that time. Id. at pp. 64-65.  At 5:30 a.m. on January 12, 2012, CCCPRC accepted Mr. Ramirez, and the transfer order to the hospital was given from HLDC's intensive care unit. Id. at p. 65.  Dr. Lugo did not treat Mr. Ramirez at the CCCPRC, nor did he have any additional intervention with him after January 13, 2012.  (Docket No. 283 at p. 11; Docket No. 331 at p. 10.)  Subsequently, Dr. Perez-Marrero perfomed an urgent re-cardiac catheterization, aspiration thrombectomy of the LAD, and PTCI of Mr. Ramirez's stents, and bypass surgery was scheduled for January 23, 2012.  (Docket No. 85 at p. 10.)  Mr. Ramirez died on January 23, 2012 at 1:35 a.m., however, while hospitalized at the CCCPRC.  (Docket No. 82-1 at p. 12; Docket No. 283 at p. 11.)

**II.  Rule 56 Standard of Review**

Summary judgment serves to assess the evidence and determine if there is a genuine need for trial. Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990).  The Court may enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

Civil No. 12-2024 (FAB)                                              5

matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it has the potential to "affect the suit's outcome."  <u>Cortes-Irizarry v. Corporacion Insular de Seguros</u>, 111 F.3d 184, 187 (1st Cir. 1997).  A dispute is "genuine" when it "could be resolved in favor of either party."  <u>Calero–Cerezo v. U.S. Dep't. of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004).  The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with definite and competent evidence.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Maldonado-Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 581 (1st Cir. 1994).  It must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" which support its motion.  <u>Celotex</u>, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  Once a properly supported motion has been presented, the burden shifts to the non-moving party "to demonstrate that a trier of fact reasonably could find in [its] favor."  <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted).  In making this assessment, the Court must take the entire record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  <u>Farmers Ins. Exch. v. RNK, Inc.</u>, 632 F.3d 777, 779-80 (1st Cir. 2011).

Civil No. 12-2024 (FAB)                                                        6

**III. Summary Judgment of Plaintiffs' Medical Malpractice Claim**

Dr. Lugo moves for summary judgment on the grounds that no genuine dispute of material fact exists regarding his medical care of Mr. Ramirez.  (Docket No. 284 at p. 1.)  He claims that he "correctly performed a catheterization" on Mr. Ramirez; that he "correctly transferred the patient" to CCCPRC; that Mr. Ramirez was stable and had a 95% chance of survival when he left HDLC's care; and that plaintiffs' expert opinion as to the standard of care applying to Dr. Lugo's treatment of Mr. Ramirez is insufficient to go to trial.  Id. at pp. 1–2.  In response, plaintiffs argue that Dr. Adams' expert testimony fully establishes a *prima facie* case of medical malpractice against Dr. Lugo, and that summary judgment must be denied.  (Docket No. 330 at pp. 1–2.)

   A.   **Medical Malpractice Standard**

Medical malpractice liability in Puerto Rico is negligence- and fault-based.  Rodriguez-Diaz v. Seguros Triple-S, 636 F.3d 20, 23 (1st Cir. 2011) (internal citation omitted).  Puerto Rico's general negligence statute, article 1802 of the Civil Code, states that "a person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage done."  P.R. Laws Ann. tit. 31, § 5141.  "Within this rubric, three elements coalesce to make up a *prima facie* case for medical malpractice (a species of professional negligence)." Martinez-Serrano v. Quality Health Servs. of P.R., Inc., 568 F.3d

Civil No. 12-2024 (FAB)                                                     7

278, 285 (1st Cir. 2009).  To prove medical malpractice in Puerto Rico, a plaintiff must establish:  "'(1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus between the breach and the claimed harm.'"  Torres-Lazarini v. United States, 523 F.3d 69, 72 (1st Cir. 2008) (citing Cortes-Irizarry, 111 F.3d at 189).

Puerto Rico law holds physicians in malpractice cases to a national standard of care.  Cortes-Irizarry, 111 F.3d at 190.  A physician's duty, therefore, is to provide patients with medical care "that, in the light of the modern means of communication and education, meets the requirements generally recognized by the medical profession."  Santiago-Otero v. Mendez, 135 P. R. Dec. 540, 1994 P.R.-Eng. 909,224 (1994); Rolon-Alvarado v. San Juan, 1 F.3d 74, 77-78 (1st Cir. 1993) (holding that a health care provider "has a duty to use the same degree of expertise as could reasonably be expected of a typically competent practitioner in the identical specialty under the same or similar circumstances") (citing Oliveros v. Abreu, 101 P.R. Dec. 209, 1 P.R. Offic. Trans. 293 (1973)).  A treating physician enjoys a presumption that he or she possessed the reasonable knowledge and skills required by the controlling medical standards, and that he or she provided reasonable and adequate care to the patient.  Del Valle-Rivera v. United States, 630 F. Supp. 750, 756 (D.P.R. 1986) (Fuste, J.).  In

Civil No. 12-2024 (FAB)                                                  8

order to overcome this presumption, a plaintiff ordinarily must provide expert testimony to outline the minimum acceptable standard of care and to conform the defendant doctor's failure to meet it. Pages-Ramirez v. Ramirez-Gonzalez, 605 F.3d 109, 113 (1st Cir. 2010).

**B.  Analysis**

At Dr. Adams' deposition, counsel for Dr. Lugo asked what standard of care applied to Dr. Lugo's medical treatment of Mr. Ramirez, and how that standard was breached. (Docket No. 332-1 at p. 116.)  Dr. Adams responded:

> I can tell you it's in Section 1.1 [of the 2011 AHA ACC Guidelines]. And in Section 1.1 [it] says . . . that coronary artery revascularization guidelines are that for multi vessel disease, particular in diabetic patients, if you go to the chart that's on [page] 2579, two vessel disease with approximal LAD lesion, which this individual had, he had 80 percent approximal LAD lesion and an associated 50 to 60 percent right coronary lesion. Level of evidence I is [Coronary Artery Bypass Grafting, CABG]. That means this individual benefits, has a higher survivability from an undergoing immediately revascularization with coronary bypass grafting.  In addition, a patient that has two vessel disease, that has evidence of previous infarct and has evidence that he has comord or co-tandem lesions as we call them, which means that the right coronary artery and the left coronary artery are co-dominant or individually dominant, that they have a lesion in either side, coronary bypass surgery is recommended as the initial strategy, barring the patient has other comorbidities like cancer, or doesn't have the ability to have a stent placed.

Id. at pp. 117–18.  In other words, "[t]his patient had multi vessel disease from the beginning of two lesions in tandem in the right coronary and the left system.  The guidelines and what a

Civil No. 12-2024 (FAB)                                                    9

reasonably trained cardiologist and cardiac surgeon would do, is *revascularize this individual operatively, not with stents*." Id. at p. 127 (emphasis added).  When asked whether his opinion was that surgical intervention "should have been considered" at HDLC, Dr. Adams clarified that "[s]urgical intervention is *indicated*, not considered.  It is *mandatory* with multi vessel disease in a patient with those two existing tandem lesions to have operative therapy." Id. at pp. 119-20 (emphasis added).  Estimating Mr. Ramirez's rate of survival upon leaving HBV to be 98%, if treated with surgical intervention, (Docket No. 283-12 at p. 78), Dr. Adams reiterated, "This is a procedure, this patient had a right ventricular infarct.  Right ventricular infarcts are notorious for re-infarct within the first 14 days.  This patient upon transfer to this hospital for his intervention, should have had a surgical procedure because he had multi vessel coronary artery disease." Id. at pp. 78-79.

Dr. Adams also acknowledged that a cardiologist can request a consultation or surgical intervention, and that "[i]t is a team approach" between the patient, cardiologist, and surgeon. (Docket No. 332-1 at p. 120.)  Citing a 2012 circulation from a Dallas, Texas meeting about shared decision making for cardiologists and cardiac surgeons, Dr. Adams read:

> When a patient has multi vessel disease, that is time that the cardiologist discuss with the cardiovascular surgeon, the appropriate strategies to manage heart disease.  In other words, the cardiologist does not have the right to make an independent diagnosis and therapy

>       treatment without a cardiac surgeon and the patient,
>       being involved in a decision making process.

Id.  Plaintiffs' expert also confirmed that when cardiovascular surgery is not performed at a hospital, the patient should be transferred, and the most reliable transfer is to the interventional cardiologist or the specialized center who knows the patient.  Id. at p. 121.  In light of Dr. Adams' cited deposition testimony, the Court finds that plaintiffs easily offer sufficient evidence of the standard of care governing Dr. Lugo's treatment of Mr. Ramirez in January 2012.

Dr. Adams' testimony also alleges Dr. Lugo's breach of that standard of care.  He testified that though Dr. Lugo properly "perform[ed] the cath in the patient, . . . call[ed] the intervention cardiologist at [CCCPRC], Dr. Perez Marrero[,] . . . and arrange[d] for the [patient's] transfer," (Docket No. 332-1 at p. 121),[1] it was simply "inappropriate to stent this type of patient to begin with.  The patient needed revascularization surgically."  Id. at pp. 126-27.  Although Dr. Lugo relieved the

---

[1] In his review of Mr. Ramirez's medical records, Dr. Adams did not see any evidence of consultation by Dr. Lugo to a cardiovascular surgeon — he only saw a record in the cardiac catheterization dated January 13, 2012.  (Docket No. 332-1 at p. 121.)  Assuming that Dr. Lugo had consulted a cardiovascular surgeon when he performed the cath at the Mayagüez Medical Center, however, Dr. Adams opined that Dr. Lugo's actions would have "absolutely" been proper.  Id. at p. 123.  He subsequently clarified that "[t]he intervention should have been a surgical referral with operative treatment and not further stent placements."  Id.

Civil No. 12-2024 (FAB)                                                11

patient's immediate chest pain by placing three stents into Mr. Ramirez, id., in the long term "the patient was left inadequately revascularized because of two vessel coronary disease." Id. at p. 128. A major shortcoming of Dr. Lugo's procedure was inadequate flow[2] in the patient's arteries: "[b]ecause the flow through the stent and down the stent is not going to support the myocardium, and the fact that this patient had abrupt occlusion again of his right coronary means the flow is insufficient." (Docket No. 332-1 at p. 113); see also id. at p. 126 ("The most common cause for in-stent thrombosis is maloccluded stent, decreased flow through the stent, and inappropriate placed stent . . . ."). After Dr. Lugo's procedure, Mr. Ramirez was stable, but he "needed urgent revascularization via surgery." Id. at p. 114. Five days later, Mr. Ramirez had another episode of chest pain due to "occlusion of the right coronary artery stent, total," and "the decision was made to take the

---

[2] Dr. Adams explained that the x-ray depicting the "flow" of Mr. Ramirez's artery "does not show adequate flow," (Docket No. 332-1 at p. 124):

> The only way to make a diagnosis of flow is to do what is called an FFR, which is a fractional flow resistance calculation. In other words, the cardiologist would put a catheter before the stent, and measure the pressure, and then put a catheter through the stent, and measure the pressure after the stent. Calculating an FFR is the only way to make a diagnosis . . . . I can tell you that if an FFR is not calculated, that X-ray, that film, does not show adequate flow.

Id.

Civil No. 12-2024 (FAB)                                                      12

patient for surgery." <u>Id.</u>  Having reviewed the entire testimony of plaintiffs' expert, the Court finds sufficient evidence of plaintiffs' theory that Dr. Lugo breached the standard of care by not consulting with a cardiac surgeon before deciding to perform an additional 3-stent procedure, because Mr. Ramirez's condition required surgery instead of further stenting.  (<u>See</u> Docket No. 330 at pp. 6-7.)

Sufficient evidence of causation also exists in the record to survive summary judgment.  As a whole, Dr. Adams attributes Mr. Ramirez's death to the various caregivers' delay in finding and providing operative therapy to Mr. Ramirez.  He summarized:

> [t]he cause of death was the inappropriate discontinuation of the Integrilin causing ingraft, in stent thrombosis.  That caused his death.  Should he [have] had surgery earlier?  Yes.  Should he [have] had surgery in the first place?  Yes.  Should the nurses have called Dr. Cancel (sic)?  Yes . . . . [T]here's joint responsibility, the nurses, the cardiologist, and the cardiac surgeon, I think I've said that.

(Docket No. 332-1 at p. 152.)  With respect to Dr. Lugo's role, Dr. Adams' deposition testimony sufficiently establishes the theory that Dr. Lugo's decision to perform a percutaneous coronary intervention with three stents rather than transferring Mr. Ramirez immediately for operative therapy caused significant damage and

Civil No. 12-2024 (FAB)                                               13

loss to Mr. Ramirez's cardiac muscle, which lead to his death.[3] (See, e.g., Docket No. 332-1 at p. 128) (explaining that after Dr. Lugo's procedure, Mr. Ramirez "was left inadequately revascularized [and had inadequate flow] because of the two vessel coronary disease"); id. at p. 129 (noting that Mr. Ramirez "ha[d] a greater than 98 percent survival chance, *if he's operated on immediately, and will not lose any myocardium*") (emphasis added); id. ("*Once he gets stented, and he has a higher incidence of in stent thrombosis, then the mortality is increased.*") (emphasis added); id. at pp. 148-49 (answering a question regarding the cause of Mr. Ramirez's death with, "The patient had stents placed, which is inappropriate for this type of surgical disease, and the patient

---

[3] The laundry list of quotations included in plaintiffs' opposition brief improperly cites to Dr. Adams' expert report dated November 28, 2013. (See Docket No. 330 at pp. 7-8.) As this Court has already held, **"because Dr. Adams' expert report is unsworn, it is an inadmissible hearsay document that cannot be considered as part of the summary judgment record."** Ramirez-Ortiz v. Corporacion del Centro Cardiovascular de P.R. y del Caribe, 2014 U.S. Dist. LEXIS 101057 (D.P.R. July 23, 2014) (Besosa, J.) (emphasis added) (citing Pack v. Damon Corp., 434 F.3d 810, 815 (6th Cir. 2006) (expert report was "unsworn and thus is hearsay, which may not be considered on a motion for summary judgment"); Capobianco v. City of N.Y., 422 F.3d 47, 55 (2d Cir. 2005) (stating that unsworn physicians' letters "generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment"); Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.")); see also Flowczenski v. Taser Int'l. Inc., 928 F. Supp. 2d 564, 570 (E.D.N.Y. 2013) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e) and cannot be used on a summary judgment motion without additional affidavit support.").

Civil No. 12-2024 (FAB)                                                    14

should [have] had an urgent surgical procedure"). Because "the treatment of the myocardium with a thrombolytic agent requires that intervention be performed timely[,] [a]nd time lost, whether it's a day, two days, [etc.] loses the recruitment ability of a myocardial cell mass," id. at p. 90, plaintiffs advance sufficient evidence that Dr. Lugo's medical treatment was a proximate cause of Mr. Ramirez's death.  Accordingly, the *prima facie* elements of a medical malpractice case against Dr. Lugo are satisfied, genuine issues of material fact exist regarding Dr. Lugo's medical care to Mr. Ramirez, and summary judgment is not appropriate.

## IV. Conclusion

For the reasons discussed above, the Court **GRANTS** Dr. Lugo's motion *in limine*, (Docket No. 342), and **DENIES** Dr. Lugo's motion for summary judgment, (Docket No. 282).

**IT IS SO ORDERED.**

San Juan, Puerto Rico, August 13, 2014.

                                        s/ Francisco A. Besosa
                                        FRANCISCO A. BESOSA
                                        UNITED STATES DISTRICT JUDGE